IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| DANIEL TANNER; R. T. (a minor); E. T. (a minor); and A.T. (a minor), | Case No. 6:17-cv-01886-AA **OPINION AND ORDER** |
| Plaintiffs, | |
| vs. | |
| CLAUDIA SALDANA and JENNIFER LANG PERKINS, | |
| Defendants. | |

AIKEN, District Judge:

Plaintiffs Daniel Tanner and his minor children R.T., E.T., and A.T. bring this action against defendants Claudia Saldana and Jennifer Perkins under 42 U.S.C. § 1983. Plaintiffs allege that Ms. Saldana and Ms. Perkins, Oregon Department of Human Services ("DHS") employees, violated their constitutional rights to familial integrity. Defendants now move for summary judgment. The Court finds this motion suitable for resolution without oral argument and, for the reasons that follow, defendants' Motion for Summary Judgment (doc. 18) is GRANTED.

## BACKGROUND

Mr. Tanner and his former spouse Adele Tanner have three children. At the time of the incidents giving rise to this case, Mr. Tanner and Mrs. Tanner were separated and involved in divorce and custody proceedings.

The Tanners shared custody of the children during their separation. In late October 2015, Mr. Tanner became concerned because the children were groggier than normal in the morning when he picked them up from Mrs. Tanner. Mr. Tanner also knew the children went to sleep much earlier than usual while staying with Mrs. Tanner. Mr. Tanner had hair from each of the children drug tested.

On November 20, 2015, Mr. Tanner told his divorce attorney that the children had tested positive for valium, cocaine, and GHB "from April 31, 2015 through October 31, 2015." Compl. ¶ 13-14. His attorney relayed that information to DHS. During the call, Mr. Tanner's attorney advised DHS that she was about to file an immediate danger petition for temporary emergency custody of the children on Mr. Tanner's behalf with the state circuit court.

That same day, defendant Ms. Saldana, the DHS caseworker assigned to the case, contacted Mr. Tanner asking him to meet her at Mrs. Tanner's house where she planned to search the home and "question [Mrs. Tanner] with the Sheriff's office." Daniel Tanner Corrected Decl. ¶ 8. When Mr. Tanner arrived, Mrs. Tanner was not home, so Ms. Saldana and the Sheriff's Deputy left without searching. Later that night, Ms. Saldana met with Mr. and Mrs. Tanner. At the meeting, Mr. Tanner signed a DHS Protective Action form allowing the children to be placed at the home

of one of Mrs. Tanner's friends. Initially, Mr. Tanner did not support that placement, but he ultimately agreed when Ms. Saldana explained that the alternative was to place them with strangers. The children were removed from Mrs. Tanner's care that night.

On November 23, 2015, both parents appeared with their attorneys in Lane County Circuit Court for a hearing before Judge Mustafa Kasubhai on Mr. Tanner's petition for temporary custody of the children. Immediate danger petitions filed before entry of a judgment in a divorce proceeding are governed by ORS 107.097,[1] which provides, in relevant part:

> (3)(a) A court may enter ex parte a temporary order providing for the custody of, or parenting time with, a child if:
>
> (A) The party requesting an order is present in court and presents an affidavit or a declaration under penalty of perjury, alleging that the child is in immediate danger; and
>
> (B) The court finds, based on the facts presented in the party's testimony, the party's affidavit or declaration under penalty of perjury and the testimony of the other party, if the other party is present, that the child is in immediate danger.

Further, if the court enters a temporary order, the party against whom the order is entered may request a hearing to contest it, which the court "shall hold . . . no later than 21 days after receipt of the request." ORS 107.097(4).

At the hearing, Mr. Tanner provided the lab results and a declaration from an expert forensic drug analyst who reviewed the test results. Mr. Tanner also provided

---

[1] The temporary custody order in this case references ORS 107.139, which applies "[f]ollowing entry of a judgment." ORS 107.139(1)(a); Dugan Decl. Ex. B. However, because the order was entered before a general judgment in the Tanners' divorce proceedings the pre-judgment provision ORS 107.097 governed the November 23, 2015 immediate danger hearing. For purposes of this case, the differences between the two provisions are immaterial.

Page 3 – OPINION AND ORDER

his own declaration and testimony subject to cross examination. Both attorneys informed the court that DHS was investigating Mr. Tanner's attorney's report. Mrs. Tanner's request to testify was denied.

The state court found that the children were in immediate danger and issued an order granting temporary sole custody to Mr. Tanner. The court explained that "[c]ustody is immediate" but clarified "with respect to whatever DHS ends up trying to do" that "if [DHS] ends up filing a petition, they certainly can, and then you will go through those steps to address where the children go and when." Dugan Decl. Ex. A at 31-32.

The order also provided that Mrs. Tanner would have supervised parenting time with the children until further order of the court. Mrs. Tanner requested a contested hearing, which the Court set for December 8 and 9, 2015. Mr. Tanner sent a copy of the order to DHS and picked up the children from Mrs. Tanner's friends' house.

On November 24, 2015, DHS filed petitions for shelter orders with the Lane County Circuit Court's juvenile division. The petitions sought DHS custody of the children alleging that the children's welfare was endangered due to their exposure to controlled substances; that both parents' substance abuse and mental health conditions interfered with their ability to safely parent the children; and that both parents lacked the parenting skills and knowledge to safely meet the children's needs. The petitions averred, incorrectly, that "[n]o other custody litigation involving the

child[ren] is pending in any other court in this or any other state." White Decl. Exs. 3-5. Ms. Perkins, a DHS Social Service Specialist, signed the petitions.

The shelter hearing was held the next day, November 25, 2015, before Lane County Circuit Court Judge Valerie Love. Mr. and Mrs. Tanner, DHS, and the children were each separately represented by attorneys. The parties discussed Judge Kasubhai's temporary emergency custody order and its effect. DHS also informed the court that the results from its own tests of the children's hair follicles were not back yet. Judge Love urged the parties to come to an agreement about where the children would stay over the upcoming Thanksgiving holiday, noting "I told you folks earlier, I was hoping you could figure something out because of the holiday, but otherwise I was continuing the hearing and DHS has removal authority" under ORS 419B.150.[2] White Decl. Ex. 2 at 12.

At the end of the hearing, Judge Love did not rule on the petitions, and instead continued the hearing until December 8, when it could be heard by Judge Kasubhai as part of the consolidated custody hearing. Judge Love stated "DHS has the authority to remove and decide where they're going to be [placed]" and reiterated "I'm not entering an order because I want to afford the parties a chance to present their case, but I think at this stage, DHS has the authority to do what they've asked to do." *Id.* at 14.

---

[2] ORS 419B.150(1)(a) provides that a DHS employee may take a child into protective custody "[w]hen the child's condition or surroundings reasonably appear to be such as to jeopardize the child's welfare[.]"

Page 5 – OPINION AND ORDER

That day, DHS took protective custody of the children and placed them back in Mrs. Tanner's friends' care.[3] DHS also signed an Extended Visitation Plan allowing the children extended visits with each parent. Rodello Decl. ¶¶ 3-4, Ex. 1 at 1. On December 3, the children were placed separately into other non-relative foster homes. Daniel Tanner Corrected Decl. ¶ 30.

From December 8 through 11, 2015, Judge Kasubhai held a hearing on the consolidated immediate danger and shelter care matters. On December 11, 2015, the court denied DHS's petition for a shelter order and ordered that the children be placed with their paternal grandparents pending his ruling on the immediate danger petition. On December 15, 2015, the court ordered that the children be returned to Mr. Tanner's custody.

## LEGAL STANDARDS

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The materiality of a fact is determined by the substantive law on the relevant issue, while the authenticity of a dispute is determined by inquiring whether a reasonable jury could return a verdict for the nonmoving party in light of the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

---

[3] Mr. Tanner's declaration states that DHS removed the children from his care on November 24. Daniel Tanner Corrected Decl. ¶ 24-28. However, at the shelter hearing on November 25, multiple parties stated that the children were in Mr. Tanner's custody at that time. White Decl. Ex. 2 at 5 (DHS attorney states "the children are currently with their father"), 10 (Mr. Tanner's attorney states that the children "have been with [Mr. Tanner] since Monday night").

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324; Fed. R. Civ. P. 56(e). "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).

## DISCUSSION

Plaintiffs allege defendants violated their First and Fourteenth Amendment rights by (1) removing the children from Mr. Tanner's custody without a court order; (2) further interfering with the family during the removal period; and (3) making multiple misrepresentations to Lane County Circuit Court in an attempt to obtain a shelter order.

### I. *Right to Familial Association Generally*

The Ninth Circuit recently explained that the constitutional right to familial association "is entirely judge-made" and courts "have variously relied on the Fourteenth, First, and Fourth Amendments" as the source of the right. *Kates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018).

Under the Fourteenth Amendment, parents' interest "in the care, custody, and control of their children" is protected as "perhaps the oldest of the fundamental liberty interests recognized by" courts. *Troxel v. Granville*, 530 U.S. 57, 65 (2000)

(plurality opinion). "Courts have characterized the right to familial association as having both a substantive and procedural component. While the right is a fundamental liberty interest, . . . officials may interfere with the right if they provide the parents with fundamentally fair procedures[.]" *Keates*, 883 F.3d at 1236 (quotation marks and citations omitted).

The First Amendment also protects family relationships "that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001) (quoting *Bd. of Dirs. v. Rotary Club*, 481 U.S. 537, 545 (1987)).

Finally, courts "evaluate the claims of children who are taken into state custody under the Fourth Amendment right to be free from unreasonable seizures rather than the Fourteenth Amendment right to familial association." *Kirkpatrick v. Cnty. of Washoe*, 792 F.3d 1184, 1189 (9th Cir. 2015), *on reh'g en banc*, 843 F.3d 784 (9th Cir. 2016) (quotation marks omitted). However, the same legal standard applies in evaluating Fourth and Fourteenth Amendment claims for the removal of children. *Wallis v. Spencer*, 202 F.3d 1126, 1137 n.8 (9th Cir. 2000).

## II. *Judicial Deception Claim*

Plaintiffs allege defendants violated their due process rights by making misrepresentations to the juvenile court in the shelter order petitions. To prevail on a judicial deception claim a plaintiff must prove that "(1) the defendant official

deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017).

Here, plaintiffs argue that defendants made multiple "wild misrepresentations" in the juvenile court petitions, including the allegations against Mr. Tanner and the statement that the children were not involved in any other pending custody litigation. Corrected Resp. at 12. Plaintiffs argue that those statements were "false," "unsupported," and "inherently misleading." *Id.* However, because the court continued the hearing and the children were removed under DHS's statutory authority, the alleged fabrications did not cause plaintiffs' alleged deprivation of liberty. Thus, even accepting Plaintiffs' allegations on their face, defendants are entitled to summary judgment on this claim.

### III. *Ms. Perkins' Personal Involvement*

Ms. Perkins argues that the claims against her should be dismissed because her involvement in the alleged violations was minimal. Defendants cannot be liable for a constitutional violation under 42 U.S.C. § 1983 unless they were "integral participants" in the unlawful conduct. *Chuman v. Wright*, 76 F.3d 292, 295 (9th Cir. 1996).

As previously discussed, defendants did not violate plaintiffs' rights by making misrepresentations to the court in DHS's shelter order petitions, which were prepared and signed by Ms. Perkins. That is Ms. Perkins' only involvement in this case. There are no facts suggesting Ms. Perkins was involved in the other alleged violations.

Because she was not an integral participant in those alleged violations, the remaining claims against her are dismissed.

## VI. *The Children's Removal*

The Ninth Circuit recently synthesized the case law surrounding removal of children by state officials:

> [T]he rights of parents and children to familial association under the Fourteenth, First, and Fourth Amendments are violated if a state official removes children from their parents without their consent, and without a court order, unless information at the time of the seizure, after reasonable investigation, establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury, and the scope, degree, and duration of the intrusion are reasonably necessary to avert the specific injury at issue.

*Keates*, 883 F.3d at 1237-38.

Plaintiffs argue defendants did not have reasonable cause to remove the children from Mr. Tanner's care and that the scope of the removal was not reasonably necessary to protect the children from illegal drugging.

### A. *Reasonable Cause for the Removal*

"[S]ocial workers[ ] who remove a child from its home without a warrant must have reasonable cause to believe that the child is likely to experience serious bodily harm *in the time that would be required to obtain a warrant.*" *Rogers v. Cnty. of San Joaquin*, 487 F.3d 1288, 1294 (9th Cir. 2007) (emphasis added). The existence of reasonable cause must be based on "specific, articulable evidence" known to the officials at the time of the seizure. *Wallis*, 202 F.3d at 1138.

The Court concludes, based on the undisputed facts in this case, that DHS had reasonable cause to remove the children after the initial shelter petition hearing. At

that time, DHS knew that they would not be able to obtain a judicial shelter order for at least 13 days.[4] DHS also had evidence that the children had tested positive for multiple dangerous controlled substances over an extended period of time, that their parents were separated and in the process of a divorce, that Mr. Tanner asserted that the drugs were administered at times when Mrs. Tanner has physical custody of the children, and that Mr. Tanner believed the drugs came from their mother, but DHS had not identified the source of the drugs. That provided reasonable cause for DHS to believe that the children were likely to experience serious bodily harm from illegal drugging while in the care of either parent within those 13 days.

Plaintiffs argue that, because Judge Kasubhai had granted Mr. Tanner temporary emergency custody of the children, DHS had no reason to believe that the children would come to harm at Mr. Tanner's home. At the hearing, the court found that there was clear and convincing evidence that the children were in immediate danger in Mrs. Tanner's care. However, in awarding temporary sole custody to Mr. Tanner, the court was not required to find that the opposite was true with respect to

---

[4] Plaintiffs assert that "DHS had several days advance notice of the issues, yet never sought to obtain a warrant to remove the children[,]" Resp. at 11, but that is exactly what DHS tried to do by filing a petition for a shelter order. Moreover, the facts alleged by plaintiffs and asserted in Mr. Tanner's declaration do not support plaintiffs' position that DHS delayed in investigating the case and in removing the children to such an extent that the delay would provide evidence of lack of exigency.

According to plaintiffs, Ms. Saldana met with both parents the day that DHS received the child abuse report and placed the children in protective custody that night. Mr. Tanner took the children back three days later. DHS filed its shelter petition the next day and removed the children the the day after that, after the initial hearing on the petition. Before the hearing, DHS took its own hair samples from the children and sent them to a lab for testing. The cases that plaintiffs rely on are distinguishable. In *Calabretta v. Floyd*, 189 F.3d 808, 813 (9th Cir. 1999), social workers took 14 days to investigate a report of abuse. Similarly, in *Rogers*, the social worker took 18 days to investigate. 487 F.3d at 1296. Here, Ms. Saldana began to investigate and initially removed the children the day of the report, and only five days elapsed between the report and the ultimate removal challenged here.

Mr. Tanner's care. ORS 107.097.[5] Although Mrs. Tanner was present and represented by an attorney, her attorney was only permitted to cross-examine Mr. Tanner and argue against the order; she was not permitted to present evidence. *See* Dugan Decl. Ex. A at 20-22 (cross-examination); 23 (court denies request for Mrs. Tanner to testify); 24 (court states that, if the order issues, the parties will present additional testimony and evidence in a future hearing); 28-29 (closing arguments). The court did not consider any evidence regarding a risk to the children in Mr. Tanner's care and did not find that the children were not at risk in Mr. Tanner's care.

Plaintiffs also argue defendants violated the temporary emergency custody order when they removed the children. However, nothing in the order barred DHS from acting within its statutory mandate. The order only allocated custody and parenting time between the two parents. Additionally, Judge Kasubhai was aware of the DHS investigation and acknowledged on the record that Mr. Tanner's custody was subject to whatever action DHS decided to take.

### B. *Reasonable Scope of Removal*

Plaintiffs argue that the scope and duration of the children's removal also violated their rights. The Ninth Circuit has held that exigency is a very limited exception to the warrant rule and simply "because *some* intrusion on a child's protected privacy and security interests may be reasonable does not mean that *any* intrusion is." *Wallis*, 202 F.3d at 1140 (emphasis in original). The reasonableness of

---

[5] As mentioned, ORS 107.097 provides, in part, that a court may "enter ex parte a temporary order providing for the custody of" a child if the court "based on the facts presented in the party's testimony, the party's affidavit or declaration under penalty of perjury and the testimony of the other party, if the other party is present, that the child is in immediate danger."

an intrusion depends on whether it is "sufficiently . . . circumscribed by the exigency that justified the [defendant's] intrusion." *Id.* at 1141 (quotation marks and citations omitted).

Mr. Tanner asserts that he was not told that DHS had created a visitation plan and did not have extended visits with his children. He also asserts that he only had two to three one-hour visits with the children while they were with Mrs. Tanner's friend. Finally, he asserts that, when the children were placed in separate foster homes, he was not informed where they were and neither Ms. Saldana nor anyone else at DHS would tell him where the children were.

Even accepting, as the Court must, that Mr. Tanner's allegations are true, the scope and duration of the removal were reasonably necessary to protect the children from the specific danger identified – drugging with controlled substances by one or both of the parents. As mentioned, DHS reasonably believed that the children were in danger at either parent's home. Under the circumstances, DHS had good cause to withhold the children's location from the parents. The children were out of Mr. Tanner's custody for three weeks, from November 24 to December 15, 2015, between the initial shelter petition hearing and the consolidated hearing before Judge Kasubhai. And the children were separated from each other for about a week, from December 3 to December 11, 2015. Given the nature of the risk to the children, the relatively short duration of the removal, and even shorter duration of the children's separation, the scope of the duration was reasonable.

Plaintiffs argue that summary judgment is inappropriate because there is no evidence that DHS conducted any investigation between the two hearings. Although that is an accurate description of the record, it was reasonable for DHS to believe that they could lawfully retain custody of the children during that time to do whatever investigation they thought appropriate (including no investigation) based on their authority under ORS 419B.150, as Judge Love recognized during the initial shelter hearing. Accordingly, defendants are entitled to summary judgment on this claim.

C. *Qualified Immunity*

Defendants argue they are entitled to qualified immunity. Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Under the doctrine of qualified immunity, courts do not award damages against a government official in their personal capacity unless (1) they violated a federal statutory or constitutional right, and (2) the right was "clearly established" at the time of the challenged conduct. *Id.* at 735. The doctrine is broad and protects "all but the plainly incompetent or those who knowingly violate the law." *White v. Pauly*, 137 S. Ct. 548, 551 (2017).

As discussed above, plaintiffs' claims that DHS violated their rights to familial association and to be free from unreasonable seizures fail as a matter of law. But even assuming plaintiffs could survive summary judgment on the first prong, defendants are entitled to qualified immunity because the rights that they allegedly violated were not clearly established at the time of the violations.

A right is "clearly established" when, at the time of the challenged conduct, "existing precedent . . . placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. The relevant, dispositive inquiry is whether a rule's contours were so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citation omitted). "The plaintiff bears the burden of showing that the right at issue was clearly established under this second prong." *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002).

Plaintiffs argue that "[t]he constitutional principles governing the exigency exception to removing a child from a parent's home without a warrant were clearly established when the defendants removed the children from Mr. Tanner's home." Resp. at 14. They assert that, based on those principles, a reasonable social worker would have known that an exigency did not exist and that "keeping the children away from their father for a time more than necessary to remedy the [alleged exigency] was also unconstitutional." *Id.*

Plaintiffs rely on *Wallis*, 202 F.3d 1126, and *Demaree v. Pederson*, 887 F.3d 870 (9th Cir. 2018) in opposing qualified immunity. Both cases address the well-

settled principle that a child cannot be removed from his or her parent without prior judicial authorization absent evidence that the child was in imminent danger of serious bodily injury in that parent's care. *See Wallis*, 202 F.3d at 1138; *Demaree*, 887 F.3d at 883. *Wallis* also addressed the principle that the scope of the removal must be reasonably necessary to protect against the alleged exigency. 202 F.3d at 1140. But the Supreme Court has repeatedly instructed courts to examine "whether the violative nature of *particular* conduct is clearly established" by controlling precedent, not whether the conduct violates a general principle of law. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (emphasis in original). Neither *Wallis* nor *Demaree* supports the conclusion that defendants' conduct in this case violated plaintiffs' rights.

*Wallis* presented "extraordinary" circumstances where the removal was based on a psychiatric patient's uninvestigated claim that her brother-in-law was planning to sacrifice his son to Satan on the upcoming autumnal equinox. 202 F.3d at 1138-40. The child and his sister were removed from their parents' care two days before the equinox and remained in protective custody for over two months, long after the exigency would have dissipated. *Id.* at 1140-41. In the present case, by contrast, there was no such clear dissipation of the risk to the children.

In *Demaree*, social workers removed children whose parents had a single nude photograph of them because of the risk that the children might be subjected to future criminal sexual exploitation. There was no evidence that the photograph in question met the statutory definition of "sexual exploitation of a minor" or that the children

had been physically abused. *Demaree*, 887 F.3d at 879, n.6. The Ninth Circuit held that the social workers violated a clearly established right because the risk that they identified "simply does not meet [the] standard [for exigent removal], as it does not involve physical injury or abuse over the applicable period of time." *Id.* at 883. Here, by contrast, DHS *did* identify an "articulable, imminent, and serious physical injury" that put the children in danger -- drugging with controlled substances by one or both parents. Moreover, unlike the potential future injury identified in *Demaree*, the injury in this case was one that the children had already suffered and posed an ongoing threat to the children. [6]

Under the circumstances, the Court concludes that the right was not "clearly established" at the time of alleged violation for purposes of qualified immunity. Defendants are therefore entitled to the protection of qualified immunity.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (doc. 18) is GRANTED.

IT IS SO ORDERED.

Dated this 11th day of June 2019.

ANN AIKEN
United States District Judge

---

[6] The Court also recognizes that *Demaree* cannot support plaintiffs' "clearly established" argument because the decision post-dates the incidents that gave rise to their claims by almost three years. Even if *Demaree* represented a perfect factual match to the present case, which it does not, it would not have been available to guide defendants at the time of the alleged violation and so does not aid in the "clearly established" analysis for qualified immunity.